UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DOCUMENT SECURITY SYSTEMS, INC.,

                         Plaintiff,                  11-CV-6528 CJS

       -v-

                                      DECISION AND ORDER

COUPONS.COM, INC.,

                         Defendant.

_____

APPEARANCES

For Plaintiff:                  Paul F. Keneally, Esq.
                              Underberg & Kessler, LLP
                              300 Bausch & Lomb Place
                              Rochester, New York 14604

                              Timothy J. Haller, Esq.
                              Christopher J. Lee, Esq.
                              David J. Mahalek, Esq.
                              Robert A. Conley, Esq.
                              Joseph A. Culig, Esq.
                              Niro, Haller & Niro
                              181 W. Madison, Suite 4600
                              Chicago, Illinois 60602

For Defendants:               Neil A. Goteiner, Esq.
                              Jessica Nall, Esq.
                              Farella, Braun and Martel LLP
                              235 Montgomery Street
                              San Francisco, California 94014

INTRODUCTION

This is an action asserting a claim for breach of contract, relating to a commercial non-disclosure agreement. Now before the Court is Defendant's motion (Docket No. [#89]) for summary judgment. Defendant's application is granted and this action is dismissed.

BACKGROUND

Plaintiff is a corporation that provides "anti-counterfeiting, authentication and mass-serialization technologies" to other businesses. Amended Complaint [#14-3] ¶ 6. Defendant produces digital and printed store coupons.  Between 2003 and 2008, Plaintiff provided Defendant with "safety paper" for printing coupons.  However, Plaintiff was also interested in selling Defendant certain anti-counterfeiting technology.

In connection with this ongoing business arrangement,  the parties signed two non-disclosure agreements ("NDAs"), one in 2003, and one in 2005. *Id*., Exs. A & B.  The pertinent 2005 NDA ("the "NDA" or "the agreement"), which Plaintiff drafted, indicated that Plaintiff was disclosing confidential information to Defendant for the following purpose: "To evaluate a potential business relationship regarding . . . technology and trade secrets of [Plaintiff] related to document printing security features." *Id*., Ex. B.  The NDA stated that Defendant could only use disclosed "Confidential Information" for that purpose.

The NDA indicated, however, that  such "Confidential Information" did not include the following types of information:

a) [information that] was known by the Recipient prior to disclosure, as evidenced by its business records; b) [information that is] lawfully received free of restriction from another source having the right to so furnish such confidential information; c) [information that is] independently developed by or for the Recipient without reference to or use of Confidential Information; d) [information that is] lawfully in the public domain other than through a breach of th[e] Agreement; e) [information that] Discloser agrees in writing is free of such restrictions; f) [information that] is disclosed by the Discloser to a third party without a duty of confidentiality on such third party; or g) [information that] is required or compelled by law to be disclosed, provided that the Recipient gives all reasonable prior notice to the Discloser to allow it to seek protective or other court orders.

Nall Declaration [#90], Ex. 6.

The agreement is strictly a non-disclosure agreement, not a license, and it specifically indicates that "[n]o license is either granted or implied by the conveying of Confidential Information to the Recipient." Moreover, as already discussed, the agreement did not envision that Defendant would use the disclosed information for any purpose other than considering whether to purchase Plaintiff's products. Consequently, the parties never negotiated royalties concerning the commercial use of Plaintiff's technology, and the agreement does not expressly provide for the payment or calculation of royalties in the event of a breach of the agreement. Rather, in terms of potential remedies, the agreement indicates only that

> any violation or threat of violation [of the agreement] will result in irreparable harm to Discloser for which damages would be an inadequate remedy and therefore in addition to its rights and remedies otherwise available at law, Discloser may seek equitable and administrative relief . . . to prevent any unauthorized use or disclosure.

*Id*.

At some time prior to 2006, Plaintiff developed the specific anti-copying technology that is the basis of this lawsuit. The technology, known as "Block-Out," is an image that is placed on a printed or digital document, and is designed to prevent photocopying of the document. Plaintiff developed the Block-Out anti-copying mechanism from a design that is widely used on currencies, including U.S. currency, and is commonly referred to as the "EURion pattern." The EURion pattern consists of a pattern of five rings. The anti-copying effect of the pattern is due to the fact that certain commercial-grade photocopiers contain a mechanism, called an "Omron chip," that recognizes the EURion five-ring pattern, and

prevents copying of documents containing the pattern.  However, many copiers, including the Court's color copier/fax/scanner,[1] and most if not all home printers and scanners, do not contain such a mechanism.  Nor, in almost all cases, does the EURion pattern prevent the copying of black-and-white documents, and almost all, if not all, retailers accept black-and-white printed coupons.  Consequently, the EURion pattern, and the Block-Out technology derived from that pattern, have limited utility for preventing the counterfeiting of coupons.[2]

The parties dispute exactly what constitutes the Block-Out technology and how it differs from the EURion pattern used on currencies.  For example, Defendant essentially maintains that Block-Out consists of a five-ring image, which can readily be observed as being just a slightly-enlarged version of the EURion pattern.  Plaintiff acknowledges that the anti-copying aspect of the Block-Out image is essentially the same as the EURion pattern, though optimized, by having slightly enlarged rings, so as to ensure that the image triggers copiers' anti-copying mechanism regardless of the type of printing method.  In that regard, Plaintiff maintains that certain copying procedures may cause the rings to appear slightly smaller, which can affect whether a copier's Omron chip is activated.  However, Plaintiff maintains that its Block-Out technology consists of more than just the five-ring image, and that Defendant "is conflating the printed Block-Out *pattern* [with] the *underlying electronic Block-Out file*,"[3] which, Plaintiff maintains, consists of "thirteen (13) separate

---

[1]HP Color LaserJet CM3530 MFP

[2]Indeed, Plaintiff's CEO, Patrick White, admitted that "Block-Out alone is somewhat lame since it only prevents color copies." (DSS005189).

[3]Pl. Response to Defendant's Statement of  Facts, ¶ 6 (emphasis added).

items of Confidential Information."[4]  Such items of information pertain to things such as the ideal location for placement of the anti-copying pattern on a coupon and the color of ink to be used.

The parties also dispute whether the Block-Out technology is covered by the NDA. On this point, Defendant maintains that the Block-Out technology is not covered by the NDA, since it is nothing more than the EURion pattern which is in the public domain, and therefore is not novel.   Alternatively, Defendant contends that even if the Block-Out technology is not the same as the EURion pattern, it was nevertheless in the public domain since Plaintiff used the Block-Out image on publicly-available printed materials such as coupons.  Defendant maintains, in that regard, that the image could be easily copied by anyone wishing to do so.  Plaintiff, though, disputes that the image is easily copied, and reiterates that Block-Out consists of the image along with the underlying electronic information about how to make the image, which is novel and not publicly-available, and which is therefore covered by the NDA.

In any event, Plaintiff maintains that in or about late July, 2006, it provided Defendant with a disc containing Block-Out technology, as well as the instructions for how to use the technology.  Plaintiff further maintains that it offered to license the information to Defendant.[5]  Such "offer" apparently consisted of Plaintiff providing Defendant with a sample of the technology to try out.  However, the parties never actually discussed or

---

[4]Pl. Memo of Law [#99]  at p. 4.  The particular elements that Plaintiff contends comprise the Block-Out technology is set forth in Plaintiff's Statement of Additional Facts [#99-1] at pp. 19-22.

[5]*See*, Wicker Deposition at p. 508.

negotiated possible royalties for the technology,[6] because Defendant informed Plaintiff that it was not interested in using the technology.

However, within a few months thereafter, Defendant began utilizing an anti-copying image, on its coupons, that also essentially consists of the EURion five-ring pattern. In that regard, Defendant maintains that it merely copied the EURion five-ring pattern from U.S. currency, which is admittedly in the public domain, and used the image to create its own anti-copying image. In fact, Defendant maintains that it created its anti-copying image before Plaintiff ever provided the disc containing the Block-Out image.

Plaintiff counters that Defendant blatantly stole its Block-Out technology, and has used it since that time without paying Plaintiff anything. Plaintiff believes that Defendant copied the Block-Out technology based, in part, on its expert's opinion that Defendant's five-ring pattern more closely resembles Plaintiff's enlarged /optimized EURion pattern than it does the basic EURion pattern found on currency. However, Defendant's expert contends just the opposite, and maintains that Plaintiff's expert's opinion is based on flawed and subjective methods.

Nevertheless, relatively soon after Defendant began using its EURion-type anti-copying technology, the exact date of which is disputed,[7] Plaintiff at least had a strong

---

[6]Boal Deposition at p. 529.

[7]Plaintiff's Rule 30(b)(6) witness testified that the company was aware of Defendant's unauthorized use of Block-Out as early as May 2007, though Plaintiff now attempts to dispute that. Defendant contends that Plaintiff cannot use statements from other witnesses to contradict its own 30(b)(6) witness in opposition to a summary judgment motion. However, as Plaintiff's counsel indicated during oral argument, there is case authority for the view that a 30(b)(6) witness's testimony is not a judicial admission that is binding on the corporation, and may be contradicted by other witnesses, the same as any other witness's testimony. *See, Great Amer. Ins. Co. of NY v. Summit Exterior Works, LLC*, No. 3:10 CV 1669(JGM), 2012 WL 459885 at *3-4 (S.D.N.Y. Feb. 13, 2012) (noting differing views among courts); *A & E Products Group, L.P. v. Mainetti USA Inc.*, No. 01 Civ. 10820(RPP), 2004 WL 345841 at *6 -7 (S.D.N.Y. Feb. 25, 2004) ("[W]hile Rule 30(b)(6) testimony is binding, some authority holds that it does not constitute a judicial admission that ultimately

suspicion that Defendant was using the Block-Out technology without paying for it.  Plaintiff contends, though, that since it was not absolutely sure that Defendant was using Block-Out, and since it had more pressing business matters to address, it did not in any way notify Defendant about its suspicions.  According to Plaintiff, it was not until several years later, in approximately 2010, that it became convinced that Defendant was improperly using Block-Out.

On October 24, 2011, Plaintiff commenced this action.  At present, the only remaining cause of action is Plaintiff's claim that Defendant breached the NDA by using the Block-Out technology.  The Court has already determined that the law of New York State applies to this breach of contract claim.[8]

Plaintiff argues that it is entitled to damages consisting of "lost profits."  Plaintiff further argues that such lost profits consist solely of an amount of money that Defendant should have paid to Plaintiff as a reasonably royalty for the use of the Block-Out technology.[9]  As already mentioned, the parties never actually negotiated any type of royalty.  Nevertheless, Plaintiff contends that such lost-profit-royalty damages amount to approximately $6.7 million.  Plaintiff maintains that it arrives at this figure by extrapolating from what other clients were willing to pay to license similar technology.  However, Plaintiff has licensed its security technology to only a small handful of clients.[10]  More specifically,

---

decides on issues and cannot be contradicted or used for impeachment purposes.") (collecting cases).

[8]*See*, Decision and Order [#28] at pp. 6-9.

[9]*See, e.g.*, Gleason Deposition at pp. 116-117.

[10]*See, e.g.*, Philip Jones Deposition at pp. 56-59.

Plaintiff has only licensed Block-Out to five clients.[11]  Furthermore, of those, Plaintiff's own expert contends that only two clients are proper comparators for determining what a reasonable royalty would have been for Defendant: Arc Worldwide ("ARC") and RR Donnelley and Sons ("RRD").  Of those two, Plaintiff contends that its license agreement with Arc "was very comparable to what a license with Coupons.com would have looked like."[12]

However, Defendant maintains that "reasonable royalty" damages are not recoverable for a breach of contract under New York law, and that in any event, neither the ARC agreement nor the RRD agreement is helpful in determining a reasonable royalty as to Defendant.  At the outset, in that regard, Defendant notes that the parties' NDA was executed in 2005, while Plaintiff never actually licensed Block-Out to anyone in the coupon industry until 2010.[13]   Consequently, Defendant contends, an agreement between Defendant and Plaintiff would have been negotiated amidst very different market conditions.  Furthermore, Defendant argues, ARC cancelled its license agreement within a few months, after paying Plaintiff only approximately three thousand dollars, because it found that Block-Out was neither effective nor worth the cost, given that it did not work with the vast majority of home printers and scanners.[14]  Defendant further contends that ARC's licensing agreement is a poor comparator for the following reasons: 1) it contemplated

---

[11]Philip Jones Deposition at p. 19.

[12]Philip Jones Deposition at p. 188.

[13]Halm Expert Report at p. 32, n. 87.

[14]RRD also questioned the value of Block-Out in light of the public availability of the EURion technology. *See*, Halm Expert Report at p. 29 (referencing November 2010 email from RRD).

ARC issuing a much smaller volume of digital coupons than Defendant issues, resulting in a monthly licensing fee of only approximately $1,500 per month, whereas Defendant would have presumably paid a smaller license fee per-transaction due to its substantially higher volume;[15] 2) it envisioned that ARC would use Block-Out on coupons for a narrow category of products, namely, Marlboro tobacco products, while Defendant issues coupons for a wide variety of products; and 3) it required Plaintiff to provide ARC with additional services that were never provided to, or required by, Defendant.[16]   Defendant similarly contends that the licensing arrangement between Plaintiff and RRD is a poor comparator, since their negotiations were likely affected by the fact that there was an existing business relationship between them, akin to that of the relationship between a contractor and subcontractor, that did not exist between Plaintiff and Defendant.[17]   Additionally, Defendant maintains that there is no evidence that RRD ever actually used Block-Out.

With regard to licenses and royalties, Plaintiff indicates that it "generally" charges royalties "either on a percentage of revenues or a per unit basis."[18]   Plaintiff further states that there is "a range" of royalty that it charges.   Plaintiff indicates that when a customer uses the technology for printing documents, the royalty ranges between 2%-2.5% "for one

---

[15]*See*, ARC License Agreement, Schedule 1 at DSS009702-DSS009703.   Meanwhile, Plaintiff maintains that Defendant has used Block-Out on "over a billion coupons across a wide range of industries." See, Plaintiff's Statement of Additional Facts  [#99-1] at ¶ 12.

[16]Halm Expert Report at pp. 36-43.

[17]Halm Expert Report at p.p. 46-47.

[18]Philip Jones Deposition at p. 21.

9

technology through – upwards of 5 percent revenue."[19]  Plaintiff states that the royalty rate

is higher for "digital renditions of our technologies."[20]  Plaintiff also set a higher price for

licensees outside the U.S.[21]  Plaintiff further states that the royalty rate is increased when

the customer uses "multiple technologies."[22]

Significantly, though, Plaintiff indicates that the actual royalty rate is negotiated

differently with each customer:

Q. Okay.  So how is it determined where in the range between 2 percent . . . and five percent – or upwards of 5 percent, you were saying, how is that determined for each licensee where in the range the price would be set?

A. It's negotiated.  It becomes a business decision primarily depending on the customer and our confidence in the customer's ability to, you know, deliver the revenue that we expect we can get from the project.

\*\*\*

[We use] value based pricing [which] is based on the concept that the – that our technology significantly enhances the end product and therefore we want to capture that increasing value to the end product.

Q. All right.  And how do you determine – how [does] DSS determine to what extent [its] technology enhances the value of the end product?

A. I think it's a negotiated process.[23]

\*\*\*

Q. ... [T]here's no standard way in which the customer is charged for use of the DSS technology; do I have that right?

---

[19]Id. at p. 22.

[20]Id.

[21]Philip Jones Deposition at p. 147.

[22]Id.

[23]Philip Jones Dep. at pp. 23-24, 39.

A. Yes, I think there's variation in pricing, yes.

Q. And that variation is part – part of that is caused by DSS shaping their price in order to fit the needs of the licensee; is that right?

A. I think pricing is, you know, mutually negotiated.  Certainly we try to obtain the best – you know, the pricing that we're looking for, and that's negotiated with the customer.

Q. Is one of the considerations for negotiating that price term the anticipated volume that a licensee is going to be using the DSS technology with respect to?

A. Yes, volume is often considered, yes.

Q. So if a  – if a licensee is anticipated to be using DSS technology on a very high volume of products, what would generally be the impact on the price that DSS would offer; would it be higher or lower?

A. It would be negotiated.  For some customers, we wouldn't provide any delineations; others, you know, we would consider it.

Q. So there's no standard – there's no standard that would be applied to the price term that's being offered based on whether it was – whether the licensee was anticipated to have high volume or low volume; is that right?

A. Yes, I would agree with that.[24]

Consequently, it is clear that Plaintiff negotiated licenses with customers on a case-by-case basis, with no standard royalty rate.[25]

---

[24]Philip Jones Dep. at pp. 157-159.

[25]*See*, Deposition of Plaintiff's CEO, Patrick White at p. 143 ("I would have to work with the client and get all the other factors.  It has to be a negotiation.").

Furthermore, Plaintiff did not view Block-Out as a "stand alone" product.  Instead, Plaintiff viewed Block-Out as an "add-on technology," to be "added-on" for an additional fee when customers were licensing other technologies, such as "Pantograph and Prism."[26] In that regard, Plaintiff admits that Block-Out by itself is "somewhat lame," and that it needs to be "layered" with other technologies.[27]  More specifically, Plaintiff indicates that Block-Out's value comes from preventing color copying, and from impressing prospective clients who may have an emotional response to seeing a demonstration where Block-Out prevents a color copy from being made.[28]  Despite all of that, Plaintiff contends that, assuming Defendant stole the Block-Out technology, it must have significant value since Defendant continues to use it.[29]

However, Defendant contends that the Block-Out technology has "no stand-alone commercial value" as a means of preventing the counterfeiting of coupons.[30]  Defendant maintains that the technology has no value since, for example, it does, as indicated above, not prevent the copying of black-and-white coupons, and all retailers accept black-and-white coupons.  Consequently, Defendant argues, the technology has, at best, "a possible, albeit speculative immaterial benefit of perhaps discouraging an uninformed, irresolute,

---

[26]Patrick White Deposition at p. 74.

[27]Patrick White Deposition at p. 83.

[28]Patrick White Deposition at p. 74.  At another point in his deposition, White indicated that despite its limited utility, Block-Out had "sizzle," because it impressed potential clients during sales presentations; see also, id. at p. 305 ("[I]t's a wow factor.") (Speculating that Defendant may find value in using the anti-copying technology to impress potential clients).

[29]Patrick White Deposition at p. 305.

[30]Halm Expert Report at p. 3.

and languid counterfeiter."[31]   In fact, Defendant maintains, its competitors in the coupon industry  do not even bother using such technology.[32]   Instead, they, and Defendant, rely primarily on other technology, that prevents consumers from being able to print multiple copies of on-line coupons from their home printers.[33]   Finally, Defendant maintains that the lack of value attributable to Block-Out is evident from the fact that Plaintiff waited several years before confronting Defendant about the alleged misappropriation of the technology. If the technology was actually worth anything, Defendant contends, Plaintiff would have acted sooner.

On March 5, 2014, Defendant filed the subject motion for summary judgment. Defendant essentially maintains that it is entitled to summary judgment for two reasons: First, it did not breach the NDA, since the NDA does not cover the subject technology; and second, even if it did breach the NDA, Plaintiff cannot recover any damages.  As to the first of these points, Defendant contends, as already mentioned, that Block-Out is not Confidential Information, because it is non-novel and was in the public domain before Plaintiff provided it to Defendant.  As for the second point, Defendant maintains that the only damages that Plaintiff is seeking are "reasonable royalties," which are prohibited by the NDA, and which under New York law cannot be recovered for a breach of contract.

Plaintiff disputes both of those arguments.  As already discussed, Plaintiff maintains that Block-Out is covered by the NDA, and that Defendant is attempting to define the technology in an overly-restrictive manner.  Again, on this issue, Plaintiff insists that Block-

---

[31]Halm Expert Report at p. 12.

[32]Halm Expert Report at p. 20.

[33]Halm Expert Report at pp. 21-24.

Out consists of the optimized five-ring image along with the underlying electronic information about how to make the image, all of which is covered by the NDA's definition of "Confidential Information."  Plaintiff contends that such information was not in the public domain and was novel, or at least novel as to Defendant.  As for damages,  Plaintiff contends that it is actually seeking lost profits, which are recoverable as contract damages under New York law.  Plaintiff admits, though, that the only profit that it lost is the amount of royalties that Defendant should have paid for using the Block-Out technology.

On or about April 24, 2014, Defendant filed its reply papers, consisting of a ten-page memorandum of law, containing lengthy singled-spaced footnotes, and 265 pages of additional material, consisting primarily of responses to Plaintiff's statement of additional facts submitted in opposition to the summary judgment motion, and supporting exhibits.

On June 6, 2014, Plaintiff filed a motion [#118] to strike Defendant's reply papers. In that regard, Plaintiff contends that Defendant's memo of law violates the ten-page limit on reply papers contained in Rules 7(a)(2)(C) and 10(a)(3) of the Local Rules of Civil Procedure, by including additional argument in overly-lengthy footnotes.  Plaintiff further contends that Defendant's reply to Plaintiff's factual assertions is not allowed by the local rules, and should be stricken.

On July 10, 2014, counsel for the parties appeared before the undersigned for oral argument.

## DISCUSSION

### *Plaintiff's Motion to Strike Defendant's Reply*

As the Court indicated during oral argument, it is denying Plaintiff's motion to strike. While it is true that Defendant may have pushed the boundaries of the Local Rule's page

limitations by using lengthy footnotes, the Court almost routinely grants extensions of those limits upon request.   Moreover, the Court generally applies such page limits to memorandums of law, not accompanying exhibits.  Finally, it does not appear that Plaintiff was prejudiced, or that the manner of Defendant's submission has any effect on the outcome of the Court's decision below.  Accordingly, Plaintiff's application [#118] is denied.

### Rule 56

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial.  Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.") (emphasis added; citations and internal quotation marks omitted); *see also, D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard*

*evidence* showing that its version of the events is not wholly fanciful.") (emphasis added); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) ("In determining whether a genuine issue of material fact exists for trial, we are obliged carefully to distinguish between evidence that allows for a reasonable inference . . . and evidence that gives rise to mere speculation and conjecture.") (citation and internal quotation marks omitted).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact.  However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Associates, L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citations and internal quotation marks omitted).

Having considered the foregoing legal principles, and the record viewed in the light most-favorable to Plaintiff, the Court finds that even assuming *arguendo* that Plaintiff has demonstrated triable issues of fact as to whether Defendant breached the NDA, that Defendant is nevertheless entitled to summary judgment since Plaintiff has not suffered any compensable damages.

### The Applicable New York Law on Damages

Defendant maintains that New York law does not permit recovery of "reasonable royalties damages" in breach of contract actions generally, and that Plaintiff's alleged damages are speculative in any event.  Plaintiff responds that it is seeking lost profits, not

16

reasonable royalties, and that its damages can be ascertained based on evidence of royalty agreements between Plaintiff and other companies.   The Court agrees with Defendant and disagrees with Plaintiff.

The general legal principles concerning contract damages under New York law are well settled:

> It is well established that in actions for breach of contract, the nonbreaching party may recover general damages which are the natural and probable consequence of the breach. In order to impose on the defaulting party a further liability than for damages which naturally and directly flow from the breach, *i.e.*, in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.

> In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered, as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.

*Kenford Co., Inc. v. County of Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179, 540 N.Y.S.2d 1, 4 (N.Y.,1989) (citations and internal quotation marks omitted).  "Another way of phrasing breach of contract damages is that, under New York law, plaintiffs are entitled to compensatory damages necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract." *Premier Florida Auto Sales and Leasing, LLC v. Mercedes-Benz of Massapequa, LLC*, No. 10 CV 4428(DRH)(WDW), 2013 WL 2177785 at *4 (E.D.N.Y. May 20, 2013) (citations and internal quotation marks omitted).

General or expectation damages for breach of contract may often include lost profits. *See*, 24 WILLISTON ON CONTRACTS § 64:2 (4th ed.) ("Because the goal of protecting the plaintiff's expectation interest is to place the promisee in the same position as performance would have done, it follows that an award of damages will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because only by awarding lost profits will the plaintiff be made fully whole."). More specifically,

> [u]nder New York law, consequential damages for lost profits are recoverable if a plaintiff can demonstrate with *reasonable certainty* that: (1) the lost profits were caused by the breach; (2) what the amount of the lost profits were; (3) the liability for the lost profits were "fairly within the contemplation of the parties" at the time the agreement was formed.

*Saenger v. Presbyterian Church of Mount Kisco*, No. 96 CIV. 7684(JFK), 1997 WL 742531 at *2 (S.D.N.Y. Dec. 1, 1997) (emphasis added) (*citing Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d at 261, 502 N.Y .S.2d at 132).

Here, Plaintiff does not maintain that it lost the opportunity to do business with any other entity as a result of Defendant's breach.  Instead, Plaintiff reasons that if Defendant had complied with the NDA, it would not have used the Block-Out technology, and that since Defendant used the technology, Defendant should have to pay for it, otherwise it would result in Defendant being able to use the technology for free without any consequences.  In that regard, Plaintiff insists that it is not seeking "reasonable royalties," but is seeking "lost profits," that were fairly within the parties' contemplation at the time the NDA was executed.

In *Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777 (7th Cir. 2014), the Seventh Circuit Court of Appeals considered a breach of contract claim that is substantially similar to the instant case.  Although the case did not involve New York law, the general principles of contract law discussed therein are applicable here.   In *Vojdani*, the parties had a confidentiality agreement concerning medical testing procedures that the plaintiff disclosed to the defendant as part of their joint business venture.  After the parties terminated their business relationship, however, the defendant continued to use the plaintiff's testing procedures, in violation of the confidentiality agreement, which caused the plaintiff to sue to recover damages.   Specifically, the plaintiff maintained that he was seeking the expectation damages that he would have received if the defendant had paid him for the use of the testing technology.  However, the Circuit Court determined that the plaintiff did not sustain any money damages as a result of the breach, since he would not have been entitled to any payment at all if the defendant had not breached the confidentiality agreement:

> Vojdani challenges the district court's grant of NeuroScience's renewed motion for judgment as a matter of law, which vacated the verdict of nearly $1.2 million for breach of the confidentiality agreement. Vojdani argues that the money would merely compensate him for the "actual loss" he suffered from the breach. NeuroScience responds that Vojdani did not and cannot prove any damages because he was not made worse off by the confidentiality agreement's violation.
>
> ***
>
> The non-breaching party may recover expectation damages and any other losses foreseeably flowing from the breach.  [However,] the non-breaching party may not be placed in a better position because of the breach than he would have been in had the contract been performed.
>
> ***

> If [Defendant] had complied with the confidentiality agreement's requirement that the company not use Vojdani's proprietary information outside of their collaboration, Vojdani would have gained nothing. His methods simply would not have been used after the collaboration ended.

*Vojdani*, 741 F.3d at 785-786 (citations omitted).[34]   Likewise, in the instant case, if Defendant had complied with the NDA and not used the Block-Out technology, Plaintiff would not have been entitled to any payment.   Consequently, even assuming that Defendant breached the agreement, Plaintiff did not suffer any expectation damages thereby, and any payment that it now receives would place it in a better position than if the contract had been performed.

Moreover, even assuming that the Court disregarded Plaintiff's protestations to the contrary, and found that what Plaintiff is really seeking is "reasonable royalties," the Court would still need to conclude that Plaintiff is not entitled to damages.   In that regard, "reasonable royalty" damages are frequently awarded in patent and trade secret cases. *See, e.g., Member Services, Inc. v. Security Mutual Life Ins. Co. of New York*, No. 3:06-cv-1164 (TJM/DEP), 2010 WL 3907489 at *27-28 (N.D.N.Y. Sep. 30, 2010) (discussing availability of reasonable royalty damages in those types of actions).   However, New York law does not permit the recovery of such damages for a breach of contract, where the agreement itself did not provide for royalties.[35] *See, Jill Stuart (Asia) LLC v. Sanei*

---

[34]As in this case, the defendant insisted that the plaintiff was actually attempting to recover reasonable royalties, but the plaintiff denied that he was, and contended that he was seeking lost profits.  Unlike this case, however, the plaintiff in *Vojdani* apparently could have recovered reasonable royalties under the applicable law.  Again, though, Plaintiff here denies that it is seeking reasonable royalties.

[35]*Compare, Inside Out Productions, Inc. v. Scholastic, Inc.*, 90 Civ. 7233 (JSM), 1995 WL 375927 (S.D.N.Y. Jun. 23, 1995) (allowing recovery of reasonable royalties, where the agreement that was breached specifically provided for the payment of royalties).  Some other states allow a party to recover reasonable royalties as damages for the breach of a non-disclosure agreement. *See, e.g., Veritas Operating Corp.*

*International Co., LTD.*, No. 12 Civ. 3699(KBF), 2013 WL 3203893 at *5 (S.D.N.Y. Jun. 17,

2013) ("The only breach of contract case [Plaintiffs] cite involved the breach of an express

royalty provision - and no such provision exists here or in the parties' other agreements.

The reasonable royalty theory of damages cannot apply.") (*citing Jim Beam Brands Co. v.*

*Tequila Cuervo La Rojena S.A. de C.V.*, No. 600122/2008 (Sup. Ct. N.Y. Co. Jul 12

2011)[36]), *aff'd* 566 Fed.Appx. 29 (2d Cir. May 14, 2014) (affirmed on other grounds); *see*

*also, Rodgard Corp. v. Miner Enterprises, Inc.*, No. 84–CV–0397E(M),1998 WL 864943

at *5 (W.D.N.Y. Dec. 8, 1998) (Plaintiff not entitled to reasonable royalties, even though

Defendant breached confidentiality agreement and utilized Plaintiff's technology).

Furthermore, even assuming that reasonable royalties were available under New

York law for breach of a confidentiality agreement, Defendant would still be entitled to

summary judgment since the "lost profits"/royalties that Plaintiff is seeking are speculative.

As to reasonable royalty damages in general, the Second Circuit has stated:

> A reasonable royalty award attempts to measure a hypothetically agreed
> value of what the defendant wrongfully obtained from the plaintiff. By means
> of a "suppositious meeting" between the parties, the court calculates what
> the parties would have agreed to as a fair licensing price at the time that the
> misappropriation occurred.
>
> In fashioning a reasonable royalty, most courts adjust the measure of
> damages to accord with the commercial setting of the injury, the likely future
> consequences of the misappropriation, and the nature and extent of the use

---

*v.Microsoft Corp.*, No. C06-0703-JCC, 2008 WL 7404617 at *3-4 (W.D.Wash. Feb. 26, 2008) (applying law
of the State of Washington).

[36]In the *Jim Beam* case, the Court wrote: "Jim Beam has not provided any precedent to support an
award of reasonable royalty damages in a breach of contract case. . . . Neither damages theory [reasonable
royalties and disgorgement] proffered by Plaintiff's expert is available as a measure of contract damages
under New York law." Decision and Order dated July 12, 2011, at pp. 7, 10.

the defendant put the trade secret to after misappropriation. To approximate the parties' agreement, had they bargained in good faith at the time of the misappropriation, the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes.

*Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151-152 (2d Cir. 1996) (citations and internal quotation marks omitted). A reasonable royalty *cannot* be calculated based merely upon what the Plaintiff claims that it "would have charged" the defendant. *Id*. at 152.

The Second Circuit has held that, even assuming *arguendo* that reasonable royalties could be recovered for a breach of contract under New York law, such damages would be speculative where there is no evidence of sufficiently-similar royalty agreements with third parties upon which to base an award:

Jill Stuart's 'reasonable royalty' theory also fails because, even assuming that a hypothetical reasonable royalty amount could support a non-speculative consequential damages determination under New York law, Jill Stuart failed to show sufficiently similar royalty contracts on which to base such a determination.

*Jill Stuart (Asia) LLC v. Sanei International Co., LTD*, 566 Fed.Appx. at 32. Other courts in this Circuit have similarly found demands for reasonable royalties to be speculative where there were neither sufficiently-similar royalty agreements with third parties nor a history of a prior licensing agreement between the parties upon which to base an award.

22

*See, Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 CIV. 7203 (DLC), 2006 WL 1359955 at *4 (S.D.N.Y. May 18, 2006) ("Use of a royalty theory of recovery is generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty."); *but see, On Site Energy Co. v. MTU Onsite Energy Corp.*, No. 10-CV-1671 (JS)(WDW), 2012 WL 2952424 at *2 (E.D.N.Y. Jul. 19, 2012) ("Although reasonable royalties are a 'seldom-used' measure of damages, largely because they are difficult to quantify, there is no *per se* rule against reasonable royalties in cases with no evidence of licensing history.") (citations omitted).

Here, there is only scant evidence of licensing agreements between Plaintiff and third parties.  Specifically, as Plaintiff's damages expert opines, there are only two such agreements that are even arguably comparable.  However, for the reasons urged by Defendant, the Court does not believe that they are sufficiently comparable to use as a basis for calculating a reasonable royalty as to Defendant.  For example, there is no evidence of any licensing agreement involving just the Block-Out technology, which is the only technology that Defendant allegedly used, and which was admittedly Plaintiff's least-effective  "stand alone" product.[37]  Instead, those agreements involved the licensing of multiple "layered" technologies, which would have affected the price.  Moreover, ARC canceled its agreement almost immediately, due to its perception that Block-Out's limited utility in blocking color copies was not worth the licensing fee.  Similarly, RRD's agreement is not a good comparator, both because RRD had a pre-existing business relationship with

---

[37]*See, e.g.*, email of Patrick White describing Block-Out by itself as being "somewhat lame." (DSS004549); *see also*, White Deposition at pp. 53-54, 66-73, 84 (Indicating that Block-Out's primary value to Plaintiff was as a sales tool to impress clients, and that as far as Block-Out's utility, it only prevented color copies, and  Plaintiff therefore considered it to be an "add on" technology to be layered with more powerful technologies such as Pantograph.)

Plaintiff and because there is no indication that RRD actually used Block-Out.  In short, Plaintiff has not shown that Defendant was similarly situated with ARC or RRD.

Moreover, it is clear that Plaintiff had no standard licensing arrangement, but rather, it negotiated each licensing agreement separately based on various factors that differ from client to client.  In that regard, the Court finds it significant that Plaintiff refused to say that any particular factor, such as volume of coupons issued, would necessarily, or even generally, cause the licensing rate to be higher or lower.[38]  Instead, Plaintiff reiterated that such factors had to be negotiated in each case, because each client was unique. *See*, White Dep. at p. 142 ("Every client's unique.  Every use is unique.").  Therefore, even viewing the disputed facts in the light most-favorable to Plaintiff, any attempt by Plaintiff to establish a reasonable royalty rate here would be unduly speculative.  Accordingly, Defendant is entitled to summary judgment.

## CONCLUSION

Defendant's motion [#89] for summary judgment is granted, and this action is dismissed.  The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated:      October 27, 2014
            Rochester, New York

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge

---

[38]See, Philip Jones Dep. at pp. 156-159.